play or attraction, along the entire line of his management, which the plaintiffs at the last moment might single out for attack.   That would put upon him a most unjust and oppressive burden.   The plaintiffs have no right to put that burden upon him, or by indirection to place him at such a disadvantage as their bill foreshadows.   It is only their concrete and specific charges which the defendant should be called upon to meet.   If they mean to say that every single play produced by the defendant during his entire term was unworthy of a strictly first-class theater, let them say so distinctly, under oath.   In that case, however, they should, at least, give play and date.   The burden of verified assertion on these specific heads is properly upon the plaintiffs; and it is only by strictly imposing that just burden upon them, and preventing its evasion, that the defendant can be protected, and can advisedly commence his preparations for the trial. The plaintiffs should also be required to specify the precise dates when they claim that the theater was actually closed in violation of the covenant of the lease.   They should also give the items of the special damage averred, namely:   First, the amount in which the patronage of their hotel has been decreased;   second, the amount lost through the diminution of guests;  third, to what pecuniary extent the hotel business has suffered;   fourth, the amount claimed for loss of its reputation and good will;   fifth, how much the value of their estate therein has been impaired and lessened.   The defendant is also entitled to the particulars of the charge of failure to protect and preserve the personal property, and to keep this property and the theater in repair.   Again, it is no answer to this demand that the defendant knows what he has done or omitted to do in the premises.   Undoubtedly, he knows what he has done or omitted to do, but still he is ignorant of the particular omission which is the subject of the charge. He is entitled to be informed on that head.   It is only when he has acquired such information that he can apply his knowledge thereto, and advisedly prepare to defend himself.

The order should therefore be reversed, with $10 costs and disbursements of the appeal, and the defendant's motion for a further bill of particulars granted, without costs, to the extent indicated in this opinion.   All concur.

---

(23 App. Div. 29.)

BROOKLYN EL. R. CO. v. BROOKLYN, B. & W. E. R. CO. et al.

(Supreme Court, Appellate Division, Second Department.   December 7, 1897.)

1. MONOPOLIES — AGREEMENT BETWEEN RAILROADS — INTERCHANGE OF PASSENGERS.

   In 1895, the plaintiff company, and the A. Co., one of the defendants, whose roads extended from the Brooklyn Bridge to Thirty-Seventh street, Brooklyn, and the W. Co., another of the defendants, whose road was leased to the A. Co., and extended from that point to Coney Island, made an agreement to facilitate the interchange of passengers.   The agreement provided, among other things, for stopping cars at a designated point of connection, and that there should be no discrimination in the rate of fare over the W. Co. in favor of any other railroad, and against the plaintiff, and that the defendants should make no connection between themselves except at Thirty-Seventh street.   *Held*, that the agreement did not create

an illegal monopolizing combination, nor restrain the exercise, in the public interest, of the corporate functions.

2. STREET RAILROADS—INTERCHANGE OF PASSENGERS—VALIDITY OF CONTRACT.
The W. Co. was organized in 1885, and was the successor of a former railroad company, and the road had been operated for nearly 20 years. A considerable part of the road was not within any city when the contract was made. *Held*, that the contract in question was not affected by Laws 1890, c. 565, §§ 103, 105, regulating contracts fixing fares for continuous trips over connecting lines of certain classes of roads, but was governed by section 78, authorizing a contract for the use by one railroad company of the road of another company, and that the contract in question was not violative of the statute.

3. SAME—BREACH OF CONTRACT—INJUNCTION.
The A. Co. and W. Co. were subsequently leased to another of the defendant companies, which assumed the obligations of their agreement with plaintiff, but subsequently connected the two leased lines, and ran through cars over them in a manner and at a rate for fares which violated the agreement. *Held*, that the plaintiff was entitled to an injunction restraining defendants from violating the contract, and to damages.

Appeal from special term, Kings county.

Action by the Brooklyn Elevated Railroad Company against the Brooklyn, Bath & West End Railroad Company and others. From a judgment for plaintiff, defendants appeal. Modified.

Argued before GOODRICH, P. J., and BRADLEY, BARTLETT, and HATCH, JJ.

Henry Yonge, for appellants.
George W. Wingate, for respondent.

BRADLEY, J. The railroads of the plaintiff and the Atlantic Avenue Company extended from the Brooklyn Bridge and other points southerly into and along Fifth avenue, to or near Thirty-Seventh street, in the city of Brooklyn; and the railroad of the defendant Brooklyn, Bath & West End Railroad Company (hereinafter referred to as the "West End Company") extended from near Thirty-Seventh street southerly to Coney Island. The controversy arises out of an alleged breach by the defendants of a contract of date April 30, 1895, made between the plaintiff and the defendants West End Company and the Atlantic Avenue Company for the close connection, for the term of 20 years, to be made between the railroads of those companies at or near Thirty-Seventh street and Fifth avenue, with a view to facilitate the interchange of passengers taken to and proceeding from that point of connection. The parties defendant to the contract agreed that their trains should stop at a designated place of connection at least one-half minute; that, through their employés on the arrival there of their cars, it would announce that "connection is to be had with the routes of the Brooklyn Elevated Railroad to Brooklyn Bridge, Fulton Ferry, and the Eastern district of Brooklyn, as well as to points south"; that no discrimination in the rate of fares would be made in favor of passengers reaching that point over the road of Atlantic Avenue Company or any other railroad company, and against the passengers of the plaintiff, which would in any way fix the rate of fare from any point reached by any of the roads of the Atlantic Avenue Company or any other railroad company to or from any point be-

yond Thirty-Seventh street and Fifth avenue reached by the route of the West End Company so that it should be less than the rate of fare charged to a passenger transferring from or to the routes of the plaintiff's railroad, unless the parties defendant to the contract should be compelled by law to transport passengers over both their routes for a single fare of five cents; that, during the continuance of the agreement, they would maintain the connection between their railroads at Thirty-Seventh street and Fifth avenue, and would not make any connection at any other point between the railroad of the West End Company and the Fifth avenue route of the Atlantic Avenue Company; and that, in case they should make any connection of their roads with any other routes of the Atlantic Avenue Company or of any other surface railroad company, then the rate of fare via such route or routes, and from and over the route of the West End Company to Coney Island and intermediate points, including the rate of fare charged by any other connecting surface lines, should not be less than the rate of fare charged to passengers using the plaintiff's route and that of the West End Company to or from Coney Island and intermediate points. This was made conditional upon the maintenance by the plaintiff of its then rate of fare. The plaintiff, on its part, agreed that it would stop all the trains "that are scheduled for points south of Thirty-Seventh street and Fifth avenue on the line of the Sea Side and Brooklyn Bridge Railroad, at its station on Fifth avenue, between Thirty-Sixth and Thirty-Seventh streets," so as to permit all passengers upon its trains desiring to do so to take the cars of the other parties to the contract, and that it would announce that "connection is to be had at that point for Coney Island and intermediate points via the Brooklyn, Bath & West End Railroad." It was also agreed that a provision specified should be made for the convenience of passengers in going from the cars of any one of those companies to those of the others, and that signboards should be erected to guide them.

The purpose of this contract apparently was for the mutual benefit of the plaintiff and the company operating the West End Railroad to result from transportation of passengers reaching the point of connection on each of those roads desiring to go southerly or northerly therefrom. At the time the contract was made, the rate of fare from points on the plaintiff's railroad to Coney Island was 15 cents, of which the plaintiff received 5 cents and the connecting road the residue. Before that time the Atlantic Avenue Company had become the lessee of the West End Company, and it was then understood that the Atlantic Avenue Company intended to connect the two surface roads at the intersection of Fifth avenue and Thirty-Seventh street. This was done, thus making a continuous line of railroad over the Atlantic Avenue and the West End roads from the bridge and other points southerly to Coney Island. There seems to have been some complaint by the plaintiff that the Atlantic Avenue Company did that to some extent without observing the provisions of the contract. But the main alleged cause of complaint occurred later, and was attributable to the defendant the Nassau Electric Railroad Company, which became the lessee of the West End and Atlantic

Avenue Railroads, and commenced the operation of them in connection with its system of routes early in April, 1896; and by the lease the Nassau Company assumed, from and after its date, all the obligations of the West End and Atlantic Avenue Companies arising upon the contract before mentioned, in reference to making connections, platforms, etc. Thereafter the Nassau Company constructed a new road, constituting an extension of the Atlantic Avenue road on Fifth avenue to a point a considerable distance south of Thirty-Seventh street, where it intersected the West End road; and since then the Nassau Railroad Company has run some of its cars over the Atlantic Avenue tracks, on Fifth avenue, through to Coney Island, and from there northerly, over the same lines, for a single fare of five cents each way, thus reducing the fare as it was at the time the contract was made ten cents. And the evidence tends to prove that those cars did not stop at the stairs constructed by the plaintiff at the station for interchange of passengers, and that no announcement was made as provided by the contract before mentioned.

The question in controversy has relation to the consequence of the nonperformance of the stipulations of the agreement made by the Atlantic Avenue and West End Companies, which the Nassau Company assumed and undertook to observe. It is suggested by the learned counsel for the defendants that the contract was in violation of the statute which provides that any street-surface railroad corporation owning or operating any such railroad in a city having a population of 800,000 or more may contract with any other such corporation for the use of their respective roads (Laws 1890, c. 565, § 103); that they shall carry between any two points, on the railroads embraced within such contract, any passenger desiring to make one continuous trip between such points for one single fare, not higher than the fare lawfully chargeable by either of such corporations (Id. § 105); and that no corporation operating a railroad under the provisions of this article, or of chapter 252 of Laws 1884, shall charge any passenger more than five cents for one continuous passage, but this section is not applicable to any part of any railroad constructed prior to the 6th day of May, 1884, and then in operation (Laws 1890, c. 565, § 101).

It is alleged in the complaint, and admitted by the answer, that the West End Company is a corporation organized in November, 1885, and in 1890 was operating a steam surface railroad; and evidence was given to the effect that prior to April 24, 1889, it was operated as a steam surface railroad, and that it was the successor of the old Gunther Railroad, and had been operated for nearly 20 years. The statute above referred to not only excludes from the five-cent fare provision railroads constructed prior to May 6, 1884, and then in operation, but includes within the provisions of section 105 those street-surface railroads only which are in cities having a population of 800,-000 or more. A considerable portion of the West End Railroad was not within a city at the time the contract was made, nor until the 1st of January, 1896, when the boundaries of the city of Brooklyn were so extended as to make them the same as those of the county of Kings. Laws 1895, c. 954. In Prospect Park & C. I. R. Co. v. Brooklyn, B. & W. E. R. Co., 84 Hun, 517, 32 N. Y. Supp. 857, it was held that the

power of such railroad corporation to contract for the use of another railroad was not dependent upon any other statutory provisions than those of chapter 216 of Laws of 1839.   In that respect that case is not authority applicable to the present case, since the act of 1839 was repealed May 1, 1891 (Laws 1890, c. 565, §§ 180, 183).   It would therefore seem that the only authority to make the contract in question was derived from the provisions of chapter 305 of Laws of 1885, and of chapter 565 of Laws of 1890; and if the West End road were treated as a street-surface railroad, within the meaning of the statute, there might be some difficulty in bringing the contract relating to it within the authority given by those or any statutory provisions. But, in view of what has already been said about the situation and location of that railroad, it may not be deemed to have been a street-surface railroad when the lease of it was made to the Atlantic Avenue Company, or at the time the contract in question was made.   The lease or contract for the use of the West End road may therefore come within the authority of section 78, c. 565, Laws 1890.   In the view taken of it, the contract in question is not within any inhibition of the statute.

It is, however, urged on the part of the defendants that the meaning and contemplated purpose of the contract were violated by the plaintiff, to their prejudice.   This charge is founded on the fact that the plaintiff did not run all of its Fifth avenue trains to the station called the "Union Depot," at Thirty-Seventh street, so as to permit its passengers for Coney Island and intermediate points to take the West End road, but, shortly before reaching that street, made connection with the Prospect Park & Coney Island Railroad, by means of an inclined plane; and by the latter road the passengers desiring to go there were taken to Coney Island.   In doing this, the plaintiff made no connection with the West End road at the Union Depot, nor did it violate the express terms of its agreement, which was that it would stop there all its trains scheduled for points south of Thirty-Seventh street and Fifth avenue on the line of the Sea Side & Brooklyn Bridge Elevated Railroad, so as to permit passengers upon such trains to take the cars of the West End road.   This, unless relieved from such imputation by some explanation, would seem to have been such an evasion of the spirit and purpose of the contract as to justify and to fairly require the denial to the plaintiff of any equitable relief founded upon such contract.

The history of the negotiations which resulted in the contract in question goes back to 1889, when a contract was made between the Prospect Park Company and the West End Company for the construction by them of a depot for their joint use and benefit at or near Thirty-Sixth street and Fifth avenue, where, and at the Coney Island terminus, their tracks were to be connected, and the proceeds of the transportation of passengers and freight upon the roads between those points were to be divided between them.   It was then contemplated that the Union Elevated road, to which the plaintiff succeeded, might be extended from Twenty-Sixth street and Fifth avenue to the depot; and a like provision was made relating, in that event, to the business

forwarded to their lines by that railroad. This contract was merged in and became part, so far as applicable, of a contract made in April, 1890, between those companies and the Union Elevated Railroad Company, reciting that the latter company was proceeding to extend its road on Fifth avenue from Twenty-Sixth street to the depot which the other parties undertook to construct, and the elevated railroad company agreed to erect and maintain a structure for its road in front of the depot. The contract contained provisions for interchange of passengers at that place. The evidence on the part of the plaintiff tends to prove that its road was so extended at the expense of $450,-000; that it in other respects performed the agreement on its part; and that, after the West End road was' leased by the Atlantic Avenue Company, it sought to, and did, in disregard of the contract, connect the two roads by a line around the depot, and taking passengers through to Coney Island at a reduced fare. This was followed by two actions of the Prospect Park & Coney Island Company for injunctive relief against the West End & Atlantic Avenue Companies, which resulted in recovery by the plaintiff. 84 Hun, 516, 609, 32 N. Y. Supp. 857, 859. Thereupon the contract in question was made, and one of its purposes was to enable the West End and the Atlantic Avenue Companies, as expressed in the agreement, to discontinue the use of the Union Depot, and, instead of that, to make surface-grade connections of those two roads at the intersection of Fifth avenue and Thirty-Seventh street. This was consented to by the contract, and done. The evidence of the president of the plaintiff is that, in the negotiation which resulted in the contract in question and at the time of its preparation, he stated to the counsel for the Atlantic Avenue Company (then the lessee of the West End road) that his company would stop some of its trains before reaching the Union Depot, and make connection with the Prospect Park road, but should run just as many trains south of Thirty-Seventh street as it generally had; and thereupon the provision was inserted limiting the trains for connection at the Union Depot to those scheduled south of there, upon the Sea Side Railroad, which was operated by the plaintiff, and extended some distance southerly. The circumstances tend to show that there was no covert advantage intended or realized by the connection made by the plaintiff with the Prospect Park road; and the fact that the usual number of plaintiff's trains were run to the Union Depot has the support of evidence.

While it may be, as claimed on the part of the defense, that the expense incurred by the plaintiff in the extension of the line of its road may not be entitled to the significance sought to be given to it as an element of consideration for the agreement, since the extension was necessary to the connection with the Sea Side Railroad, the benefits to be derived from the interchange of passengers may have been some inducement to the plaintiff to do it when and as it was done, as well as to make the preparation which was made by it at the depot to facilitate the accomplishment of such purposes.

There is no question of consideration requiring attention; nor is the contract repugnant to any statute. It is, however, urged with

much force and ability by counsel, that the contract is void, as against public policy, in that its purpose was to control passenger rates, prevent competition, subordinate public accommodation to private interests, and to disable the defendants from the performance of the duties which they in their relation to the public assumed.   This is based mainly on the fact that the parties, as such corporations, cannot deny to the public the benefit of the contemplated service for which their franchises were granted to them.   This is so, and they have no powers except those derived from their charters, and such as are incidental and reasonably essential to the execution of them, and to accomplish the purpose of their creation.   Nor can such a corporation transfer or surrender its corporate property or franchises to another, except so far as it is permitted to do so by the statute.   But in this state it has been deemed for the public interest to permit railroad corporations to enter into contracts by which one may grant to another to use and operate its road, and to make connections with a view, in practical effect, to unite in one continuous line of railroad the roads of different companies, and, as the consequence, to make pro rata division between them of the proceeds of the transportation upon the united lines.   In this respect there is no limitation except as to parallel lines.

The leading purpose of the railroads of the parties in the present case was, and will continue to be, the carriage of passengers.   In that view the contract in question was made to so connect, in time at least, the arrival and departure of trains upon the respective lines of road at the specified place of connection, as to practically afford to passengers a continuous passage to their places of destination.   This was an accommodation to travel upon those lines of road, and so far the arrangement may be deemed commendable rather than objectionable.   But it is said that by the contract the parties entered into a combination to keep up a rate of fare, regardless of circumstances which might arise to induce some or one of the parties to the contract, if untrammeled by it, to reduce the rate of fare.   It may be observed that the fare chargeable upon railroads is so regulated by the statute that the companies cannot charge in excess of a certain rate.   There was no provision in the contract for the increase of fare upon any of the roads, nor was there any provision requiring any of the parties to maintain any specific rate of fare.   What the plaintiff required, and to which the other agreed, was that they should make no discrimination in the rate of fare over the West End Railroad, in favor of any other railroad, and against the plaintiff.   The parties defendant to the contract were not denied by it the right to carry passengers southerly from the Union Depot at as low a rate of fare as they pleased.   All that they agreed to do in that respect was to charge no more for transporting the plaintiff's passengers than they charged to carry those from any other railroad.   This provision of the agreement is not substantially other in its effect than that which provides that in case connection should be made between the West End and Atlantic Avenue roads, or by them or either of them, with any surface railroads on any streets other than the Fifth Avenue route of the

Atlantic Avenue Company, the rate of fare by the way of such route, and from and over the West End route to Coney Island and intermediate points, including the rate charged by any of the other connecting roads, should not be less than the rate charged to passengers using the plaintiff's road and the West End Railroad to the same points. The apparent purpose and effect of this provision was that the parties defendant to the contract should not, by any connections made by them, discriminate against the plaintiff in the rate of fare charged to passengers from any other line of road who were carried on the West End road, and to it on the Atlantic Avenue road. This stipulation was also conditional upon the maintenance by the plaintiff of its rate of fare before mentioned. The Atlantic Avenue Company could lawfully charge no more than such rate of five cents on its line. And if, by such connection with another road, it should become necessary for the Atlantic Avenue and West End roads to reduce the rate of fare charged to passengers received at such connections to comply with the stipulation of the contract, it would not be prejudicial to the passengers or to the public. Nothing unreasonable, so far as relates to the public, appears in these several provisions of the contract. The plaintiff had no concern in the matter of rates of fares charged by the other parties to the contract. They simply, in that respect, undertook not to discriminate against the plaintiff in consideration of that which the plaintiff did and undertook to do to facilitate and make connection and interchange of passengers with them. And the same may be said of the provision of the contract that the West End and Atlantic Avenue roads would make no connection between themselves at any point on the Fifth avenue route of the latter, other than that at Thirty-Seventh street, where they agreed to maintain their connection during the continuance of the contract. In this connection it may be observed that the Atlantic Avenue Company was then the lessee of the West End road, and therefore, for the practical purposes of their operation, both constituted one line of railroad; and that fact may have had some significance in its application to some of the provisions of the contract, especially that relating to the rate of fares in case of connection with other surface railroads.

We fail to find in the contract any stipulations which may be deemed as ultra vires, or any the observance of which would result in any unwarrantable monopolizing combination, or in any restraint of the corporate functions which the parties to it, or any of them, should or might lawfully be required to exercise to subserve the public interest. No reason therefore appears why we should not follow as authoritative the two cases of Prospect Park & C. I. R. Co. v. Brooklyn, B. & W. E. R. Co., 84 Hun, 516, 32 N. Y. Supp. 857, and Same v. Atlantic Ave. R. Co., 84 Hun, 609, 32 N. Y. Supp. 859. All the cases cited by the learned counsel for the defendants have been examined, and, while they tend to support his line of reasoning, they are so distinguishable from the present case that they do not have any necessary application to the facts, as viewed here, upon which its determination must be predicated. It follows that the plaintiff was entitled to injunctive

relief.    But the judgment in 'that respect should be so modified as to
enjoin the defendants from violating the contract, as specified in the
judgment, rather than enjoining them, as it does, from operating
their lines of road until they do cease such violation.    This may in
some sense be more formal than substantial; yet it is preferable, as it
requires them, in the operation of the roads, to do it only in compli-
ance with the provisions of the contract; and, in thus enjoining the
defendants, the court is acting advisedly as to the extent of the relief
in that respect granted.    It is not seen that the judgment as entered
may not be broader in its effect than the purposes in view fairly re-
quire or justify.

The further relief incidental to that of equitable cognizance, and
relating to the damages for the alleged breach of the contract and the
recovery had of them, presents a question not free from doubt and
difficulty upon the evidence; and the fact that it is difficult to ascer-
tain and estimate the damages furnishes a reason in support of the
equitable remedy.    A careful examination of the evidence does not
enable us to reach a very satisfactory conclusion as to the amount
of the loss suffered by the plaintiff for the alleged cause.    The evi-
dence on the part of the plaintiff on the subject related simply to the
reduction of the passenger traffic of the plaintiff during the eight
months from April to November, 1896, inclusive, from the connection
with the West End Railroad, as compared with that during the same
months in 1895, as represented by the number of tickets sold at the
Thirty-Sixth Street and Fifth Avenue Station.    The tables of figures
presented by the evidence tended to show that the falling off in the
number of passengers going north on the plaintiff's road from the
West End road was such as, at five cents each during the period in
question, would amount to $13,341, which is said to have been a re-
duction of 59.54 per cent. in the receipts of the plaintiff therefrom.
If all the conditions except those arising from the violation of the
contract had continued to be the same in 1896 as in the previous year,
that statement would have been a reasonably fair basis for estimate.
There were in the later year co-operative causes for the diversion of
passenger traffic.    Among them was, notably, the reduction, early
in 1896, of the rate of fare upon certain lines of the Brooklyn City
Railroad, coming in competition with the West End and Prospect
Park Railroads.    In obtaining the amount before mentioned, the
plaintiff has sought to deduct, and has deducted, the travel derived by
the plaintiff's road from its connection with the Prospect Park &
Coney Island Railroad, in 1895 and 1896, so far as represented by
tickets sold by that company at such station.    The evidence in that
respect, however, is not very satisfactory, since the statement made
by the witness, and represented by his figures, did not include the
through passenger traffic to and from Coney Island over that and the
plaintiff's road; and therefore there are no means of determining
from the evidence the extent of traffic derived by the plaintiff from
the connection of its road with the Prospect Park road.    This
through travel, by way of that road, over the plaintiff's elevated road,
is said to be included in the statement of the number of passengers
carried on all its lines of road, exclusive of those taken from that sta-

tion, in which statement the reduction of the number of its passengers during the same period in 1896, as compared with those of 1895, is represented as 16.21 per cent. It is suggested on the part of the plaintiff that the amount before mentioned should be doubled on the assumption that the falling off in number of passengers going south over its road was substantially the same, and attributable alike to the alleged cause. It is very likely that some passengers who were carried upon the Atlantic Avenue and through on the Nassau would have taken the elevated road to Thirty-Sixth Street and Fifth Avenue Station in the absence of the through connection of those surface roads; but, if such connection had not been made by them at the reduced rate of fare, it cannot, in view of the facilities thus existing, be assumed nor presumed that the most of them would have taken any specific line of railroad. And, for that and the further reasons hereinafter stated, the figures before referred to do not, by comparison merely, furnish any satisfactory aid in relation to the passenger travel southerly to that station over the plaintiff's road during the time in question.

It may be observed that through passenger service to Coney Island was inaugurated by the plaintiff in May, 1896, and less fare was charged on its through trains than the rate was through the connection with the West End road at the time the contract in question was made; and, as it does not appear how much travel there was on those through trains over the plaintiff's Fifth Avenue and Prospect Park line in 1896, it cannot be seen how much was by that cause diverted from the West End road; and it is equally difficult to surmise how much the traffic on the latter road may by that means have been reduced if the Nassau connection and its reduction of fare had not been made. There certainly would have been much reason to suppose that the through route of the plaintiff by way of the Prospect Park road would have been preferable to the transfer connection with the West End road, even at the same rate of fare; and more so with that rate reduced as it was, although not as low as on the Nassau cars. This was applicable both ways; and it reasonably may be treated as a significant co-operative cause for the reduction of the traffic on the West End road in 1896. For the reasons before given, no means for information of the travel over or from the Prospect Park road, in connection with the plaintiff's Fifth Avenue line, are furnished by the evidence. It is quite evident that, if the through train system had not been adopted by the plaintiff, the number of tickets sold by the Prospect Park Company at the Thirty-Sixth Street Station for deduction from the number sold there by the West End Company in 1896 less than in 1895 would have been considerably increased, and thereby the sum before mentioned considerably reduced. By reference to the table of figures, it appears that the number of tickets sold by the Prospect Park Company in April, 1896, was substantially the same as in April, 1895; and there was some falling off in May, and a very great falling off in the months following it in 1896, to and including November. The percentage of it was very much more than was the reduction in number of tickets sold during the same time by the West End Company at that station. How much of this was attributable to

the plaintiff's through trains over the Prospect Park road is a subject of inquiry, as to which the evidence furnishes no satisfactory answer.

While the fact that the proof and estimate of damages resulting from breach of a contract may be difficult is no reason why recovery should be denied, there must nevertheless be reasonable support in the evidence and the inferences derivable from it for the amount awarded.   Wakeman v. Manufacturing Co., 101 N. Y. 205, 4 N. E. 264.   The plaintiff's loss from the alleged cause during the eight months preceding the trial is so difficult to determine that the estimate of damages must be founded on data not demonstrable to entire satisfaction; and, while it cannot be definitely said that they may or may not have amounted to the sum of $15,000 awarded by the trial court, we are able to make some deductions, which appear to us somewhat reasonable, from the evidence that the percentage of loss was such as to require the reduction of the plaintiff's recovery to $10,000. If the defendants had so desired, this issue, upon their application, could, by the direction of the court, have been tried by jury.   Lynch v. Railroad Co., 129 N. Y. 274, 29 N. E. 315.

The injunctive relief granted by the judgment should be modified as above suggested, and the damages recovered reduced to $10,000; and, as so modified, the judgment should be affirmed.   All concur.

---

NEW YORK CENT. & H. R. R. CO. v. BRENNAN et al.

(Supreme Court, Appellate Division, Fourth Department.   December 18, 1897.)

1. EJECTMENT—SECOND TRIAL—RES JUDICATA.
    Where a judgment in ejectment, after being affirmed, is vacated under Code Civ. Proc. § 1525, which provides that within three years after a final judgment in ejectment, upon the application of the party against whom it was rendered, upon the payment of costs, it must be vacated, and a new trial granted, if, in the new trial, the evidence is the same as in the former one, the former judgment is conclusive, unless there was error in admitting or excluding evidence, or unless a question of fact was raised which was overlooked on the former trial.

2. SAME—EVIDENCE—ADVERSE POSSESSION.
    In ejectment, where the defense is adverse possession, evidence on behalf of the plaintiff that parts of the land embraced in the grant under which plaintiff claims had been occupied by the various grantees down to the present time is inadmissible, where none of the portions so occupied included any portion of that in dispute.

Appeal from trial term.